E-FILED
Wednesday, 26 August, 2026 01:35:19 PM
Clerk, U.S. District Court, ILCD

**IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

MIDDLE FORK CATTLE COMPANY, LLC, an Illinois limited liability company,
Plaintiff,

v.

BENTON DAIRY LLC, an Indiana limited liability company,
Defendant.

Case No. 2:26-cv-02098-JEH-RLH

**Order**

Now before the Court are Defendant Benton Dairy LLC's Motion to Dismiss Counts III and IV (D. 8) and Plaintiff Middle Fork Cattle Company, LLC's Motion to Dismiss Certain Counterclaims and Strike Certain Affirmative Defenses (D. 20).[1] The Motions are fully briefed, and for the reasons set forth *infra*, the Defendant's Motion to Dismiss Counts III and IV is GRANTED, and the Plaintiff's Motion to Dismiss Certain Counterclaims and Strike Certain Affirmative Defenses is GRANTED IN PART AND DENIED IN PART.

**I**

**A**

On April 1, 2026, Plaintiff Middle Fork Cattle Company, LLC (Middle Fork) filed its Complaint against Defendant Benton Dairy LLC (Benton) seeking damages, injunctive relief, and a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202. Plaintiff Middle Fork operates

[1] Citations to the electronic docket are abbreviated as "D. ___ at ECF p. ___."

a cattle farming and feeding business near Potomac, Illinois with its principal place of business in Vermilion County, Illinois while Defendant Benton is a large dairy operator with its principal place of business in Indiana. The Plaintiff includes the following four counts: declaratory judgment; breach of contract; injunctive relief (specific performance of calf purchase rights); and fraudulent inducement.

Specifically, the Plaintiff alleges[2] in its Complaint that beginning in early 2025, it and Defendant Benton engaged in negotiations for the parties to enter into a rental agreement where Middle Fork's cattle farm would be used as a calf-raising operation. Benton was seeking additional facilities to house up to 5,000 newborn dairy calves. Middle Fork's owner, Charles "Chuck" Raup was initially operating the Potomac, Illinois farm as a beef cattle feedlot with third-party cattle but was open to the idea of repurposing the facility for Benton's needs. In February 2025, Benton, through its representatives including John Boerman, expressed an urgent need to start placing some calves at Middle Fork's facility by the fall of 2025, with calf numbers increasing significantly in the spring of 2026 as more calves were born in Benton's existing operations. Plaintiff Middle Fork emphasized during negotiations that it required a reliable start date for rent payments because it would be giving up its current cattle business and the associated revenue to free up space for Defendant Benton.

In April 2025, Defendant Benton provided an initial draft of a rental agreement proposing a 60-month term to begin "on the date Benton's calves are first housed at the Facility." Plaintiff Middle Fork objected because it would allow Benton to delay bringing cattle and thus delay rent indefinitely. After multiple meetings and communications, Middle Fork insisted that the rental agreement

[2] At the motion to dismiss stage, a court "accept[s] the well-pleaded facts in the complaint as true and draw[s] reasonable inferences in the plaintiff's favor." *Bronson v. Ann & Robert H. Lurie Child.'s Hosp. of Chi.*, 69 F.4th 437, 448 (7th Cir. 2023).

commencement be tied to Middle Fork obtaining the necessary permit to start construction of an addition to the facility and allow the use of the facility. As Middle Fork explained to Benton, that change was critical to ensure Middle Fork would not be left without income while Benton prepared to occupy the farm. Defendant Benton's representatives, including its principal John Boerman, understood and agreed to this revision which was incorporated into the final contract. Even though that date would not have represented the date that all work would be done on the property, the date was deemed to be an appropriate date that Benton's construction activities would necessitate a facility that was mostly empty of other cattle and would adequately protect Middle Fork's need for income while it paid its mortgage and other overhead expenses.

On June 26, 2025, the parties executed the Middle Fork Calf Facility Rental Agreement (Rental Agreement). The Rental Agreement has a primary term of five years (60 months) with automatic annual renewals unless notice of non-renewal is provided. The Rental Agreement obligates Defendant Benton to pay a base rent of $73,500 per month and identified various other mutual obligations to facilitate Benton's calf-raising operation at Plaintiff Middle Fork's property. The following provisions are included:

a. Term Commencement: "The Initial Term of this Rental Agreement shall begin ten (10) days after MIDDLEFORK [sic] obtains the necessary permit to allow BENTON to house calves at the FACILITY (the 'Commencement Date') . . . ."
b. Permitting and Construction: Middle Fork agreed to "Construct and maintain FACILITY according to the engineering plans agreed to by BENTON and MIDDLEFORK [sic] that are attached [to the Rental Agreement] as Exhibit C", with Middle Fork responsible for capital

improvements and obtaining at its own cost "all licenses and permits necessary for the use and occupancy of the FACILITY".

c. Right of First Refusal to Purchase Calves: Benton granted Middle Fork "a right to purchase newborn calves born in the state of Indiana and Illinois (if any) that will not be retained as beef on dairy animals." The "price as well as other relevant terms offered to MIDDLEFORK [sic] shall be negotiated between the parties in good faith, and should approximate terms of sale, including price, of another bona fide willing or able buyer at arms length . . . ."

Pl.'s Compl. (D. 1 at ECF pp. 5-6) (quoting Pl.'s Ex. A Rental Agreement (D. 1-3)). Plaintiff Middle Fork alleges the right of first refusal provision was a critical part of the bargain for Middle Fork because, by securing access to Benton's excess calves, Middle Fork expected to generate substantial profits through resale or raising of those calves. The Rental Agreement contemplated other income for Middle Fork including fees from providing feed, bedding (such as corn stover), and other supplies or services to Benton as part of the arrangement. Benton's occupation of the facility was also expected to "facilitate synergies for Middle Fork's operations (e.g. utilization of Middle Fork's existing resources and infrastructure for a share of Benton's calf-rearing needs)." Pl.'s Compl. (D. 1 at ECF p. 6).

Middle Fork had to immediately notify all of its other customers after signing the Rental Agreement that they would need to make other plans to find facilities and feed for their younger cattle. It immediately engaged the consulting services of Nic Anderson, a permitting expert, to assist the parties in moving the permit process forward quickly. Middle Fork needed Benton's input and build-out decisions to complete the engineering work as the engineering plans necessarily needed to be complete to apply for the permit.

Defendant Benton assigned two employees to work on the project. Employee Jacob Achen began to appear onsite and another manager was assigned to manage the facility after it was operational. Jacob was the son of the principal owner of Benton, Craig Achen. The two employees were to assist Middle Fork in making the decisions needed for the engineering report and begin preparing the site per Benton's responsibilities. After some preparation work, the employment of Jacob and the other employee was abruptly terminated, and Benton took several weeks to replace them while Middle Fork continued to liquidate its cattle business due to the notices it had already given to its customers. Eventually, Benton replaced the managers, and the new manager was assigned and wanted to go in an entirely different direction with which building to renovate to keep its equipment in. Middle Fork accommodated the request and gave up the use of that building so that they could commence construction and "hopefully" get back on track with its timeline. Pl.'s Compl. (D. 1 at ECF p. 7).

Throughout late summer and fall 2025, Benton's crew and contractors performed intermittent work on the site, including installing plumbing, concrete flooring, insulation, electrical upgrades, and framing interior rooms in the barn for Benton's use. But progress was slow, and by mid-fall 2025, Benton had not yet moved any cattle into the facility, and significant portions of the intended calf housing improvement remained unfinished.

Plaintiff Middle Fork promptly obtained the necessary Illinois Department of Agriculture permit to expand and operate the facility for housing up to 5,000 dairy calves. It received approval of its Notice of Intent to Construct for the expansion on or about September 15, 2025, and by September 22, 2025, the Illinois Department of Agriculture (IDA) had authorized Middle Fork to commence construction and house the full complement of 5,000 calves at the site. Middle Fork alleges the permit approval is evidenced by official documentation from the

IDA. Middle Fork also undertook substantial construction to prepare the farm for Benton's specialized use, including converting its former beef feedlot into a calf-raising facility and modifying existing barns per the agreed-to plans. By mid-September 2025, Middle Fork had mostly emptied its barns of all other cattle to make room for Benton's calves.

Pursuant to the Rental Agreement, the initial term and Benton's rent obligations were slated to begin 10 days after Middle Fork's permit was obtained which was, per Plaintiff Middle Fork, late September or early October 2025. Thus, per Middle Fork, monthly rent payment became due from Benton starting at that time and each month thereafter for the duration of the Rental Agreement. Concerned about delays, Middle Fork consistently urged Benton to proceed with performance and reminded Benton that the Rental Agreement's modified term provision required rent to begin shortly after permit issuance, regardless of whether Benton had moved calves in. Benton insisted that it would not start paying rent or delivering calves until it was "ready", which was projected to be several months later. It offered no compensation or concessions for the delay. Middle Fork objected to any further postponement of Benton's obligations.

By late 2025, no calves were delivered to Middle Fork's facility, Benton made no rent payments on October 1, November 1, or December 1, 2025 nor on January 1, 2026. Middle Fork served Benton with a Notice of Default and Demand for Cure dated January 27, 2026, and thereafter, Benton immediately ceased doing its work to get the facility ready, told its employees and contractors to stop, and began "incognito" effort to remove all of its fixtures and personal property. Pl.'s Compl. (D. 1 at ECF p. 9). Many of those items were attached to the property. On January 30, 2026, Middle Fork received a call from one of Benton's contractors indicating that they had been told to remove electrical boxes and other fixtures which would have left Middle Fork without power at the facility and left it powerless for an

extended period of time. The police were contacted and requested to stand by as Middle Fork locked the facility. Benton then sent dozens of tractor trailers to the site to remove its remaining supplies. Upon vacating the property, Benton sought to buy the entire property from Middle Fork by giving discounted offers.

In a letter dated February 19, 2026, Benton's attorney asserted that "over seven months have passed and Middle Fork has not readied the New Calf Facility to house newborn calves," and declared Benton was "revoking its acceptance" of the Rental Agreement, effective immediately. *Id*. at ECF p. 10. Plaintiff Middle Fork alleges that by backing out of the deal, Benton deprived it of multiple expected revenue streams, and Middle Fork also incurred substantial costs such as expenditures to obtain the state permit, engineering fees, and costs to construct and later re-restore its property. Middle Fork alleges it was left with half-finished construction, faces ongoing expenses from maintaining the now-empty 40-acre calf facility, and lost the business of prior cattle clients. Lastly, Plaintiff Middle Fork alleges that after securing its commitment and causing it to shut down its existing operations, Defendant Benton sought to force Middle Fork into a distress sale of the facility.

On June 4, 2026, the Plaintiff filed is Motion for Preliminary Injunction requesting the Court enter a preliminary injunction compelling the Defendant to specifically perform its obligations under Section (h) of the Rental Agreement and enjoining the Defendant from selling or transferring any such calves to third parties without first giving the Plaintiff an opportunity to purchase them, to remain in effect until final judgment or further order of the Court. A hearing on that Motion will be set via separate text order.

**B**

On June 15, 2026, Defendant Benton filed its Answer, Affirmative Defenses, and Counterclaims (D. 11). Benton included eight affirmative defenses: failure of

conditions precedent; impracticability, impossibility, and frustration of purpose of performance; prior material breach by Middle Fork; waiver/estoppel; failure to mitigate; setoff/recoupment; failure of consideration; and constructive eviction. The Defendant includes five counterclaims: breach of contract; declaratory judgment; conversion; replevin; and unjust enrichment.

In support of its counterclaims, Benton alleges[3] because Plaintiff Middle Fork's facility was being used to house beef cattle, substantial renovations were necessary prior to the "Commencement Date" of the parties' June 26, 2025 Rental Agreement in order to accommodate dairy calves. Middle Fork's obligations under the Rental Agreement included renovation of the Grower Sheds to house approximately 2,000 calves and included construction of the calf hutch pad, a large earthen and gravel area where Benton would house 3,000 calves, according to the Engineering Plan agreed to by the parties and attached to the Rental Agreement. Middle Fork's obligations under the Rental Agreement also included obtaining the necessary permit(s) to operate a livestock facility to house 5,000 newborn calves and to comply with all laws, ordinances, rules, and regulations that are applicable to use and occupancy of the facility for housing 5,000 newborn dairy calves.

Following the parties' execution of the Rental Agreement, Benton began efforts to ready a barn on the premises for milk mixing necessary to feed 5,000 newborn dairy calves. It entered into the site and engaged contractors to perform its obligations prior to bringing calves on the site, including pouring concrete floors in the milk mixing barn, upgrading electrical systems in the barn, build-out of a milk mixing and preparation equipment, installing heaters and fuel tanks on

[3] The Court similarly accepts as true the well-pleaded facts in Defendant Benton Dairy's Counterclaims and draws reasonable inferences in its favor upon consideration of Plaintiff Middle Fork's Motion to Dismiss. *Cozzi Iron & Metal, Inc. v. U.S. Off. Equip., Inc.*, 250 F.3d 570, 574 (7th Cir. 2001).

site, upgrading the office in the milk mixing barn, and bringing straw bales onto the site, among other items.

Defendant Benton alleges Middle Fork failed to provide it with a copy of any approved permits to house 5,000 newborn dairy calves at the facility and otherwise failed to undertake its obligations necessary to make the site permissible to house 5,000 newborn calves as required by the Rental Agreement. In November 2025, Middle Fork informed Benton it was still seeking financing for the necessary upgrades to the facility. Middle Fork continued to house cattle at the site throughout all of 2025 and into 2026, and it knew Benton could not commingle newborn dairy calves with existing cattle Middle Fork still had on site.

In January 2026, Middle Fork alleged that rent was due from Benton, but Middle Fork did not invoice Benton for rent in September, October, November, or December 2025, and at no time prior to January 2026 had Middle Fork communicated to any Benton owner or employee that rent was due or prior rent payments were past due. At no time prior to January 2026 had Middle Fork notified Benton that the Commencement Date in the Rental Agreement had occurred. In a January 27, 2026 letter, Middle Fork's counsel requested payment of rent and other items, alleged that a "default" of the Rental Agreement had occurred but the grace period for cure had "long since expired", and Middle Fork demanded payment of $323,327.19 and other unknown compensation within 5 days. Def.'s Answer (D. 11 at ECF pp. 11-12).

On January 28, 2026, Benton's counsel emailed counsel for Middle Fork and asked for copies of all permits to operate from the IDA and Illinois Environmental Protection Agency and asked when Middle Fork's cattle had vacated the premises. On January 29, 2026, Middle Fork's counsel provided a screenshot purporting to be a "permit" for "beef" cattle which lacked any specifics or approved plans. On or about January 29, 2026, Middle Fork asked Benton to refrain from any on-site

activities in the coming weekend because Middle Fork's owner needed to attend a funeral and wanted to secure the site. Benton honored the request. Over the weekend of January 31-February 1, 2026, Middle Fork added locks to the facility and failed to provide keys to Benton. The facility remained unsuitable to house 5,000 newborn dairy calves as of February 1, 2026.

On February 19, 2026, Benton's counsel notified Middle Fork that over seven months had passed without the facility being readied to house newborn calves, that Middle Fork had not provided an operating permit, that construction per the Engineering Plan had not been completed, and that Middle Fork had locked and blocked access to the facility, preventing Benton's further site access and preparation activities. Benton revoked its acceptance of the Rental Agreement and further identified various items of personal property and supplies that remained on the site that belonged to Benton. Middle Fork refused to allow Benton to remove its personal property following Benton's request to access the facility, in spite of Benton's multiple follow up demands for Middle Fork to return its personal property.

**II**

Federal Rule of Civil Procedure 12(b)(6) governs whether a complaint fails to state a claim. FED. R. CIV. P. 12(b)(6). Federal Rule of Civil Procedure 8(a)(2) provides that a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" FED. R. CIV. P. 8(a)(2). A "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. A plaintiff "must give enough details about the subject-matter of the case to

present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft*, 556 U.S. at 678 (quoting *Bell Atl. Corp.*, 550 U.S. at 555). Similarly, a complaint that "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" will not survive a motion to dismiss. *Id.* The Court is to draw all reasonable inferences in favor of the non-movant, but the Court "need not accept as true any legal assertions or recital of the elements of a cause of action 'supported by mere conclusory statements.'" *Vesely v. Armslist LLC*, 762 F.3d 661, 664-65 (7th Cir. 2014) (quoting *Alam v. Miller Brewing Co.*, 709 F.3d 662, 666 (7th Cir. 2013)).

**A**

Defendant Benton argues Count III for injunctive relief and Count IV for fraud in the inducement of Plaintiff Middle Fork's Complaint must be dismissed for failure to state a claim.

**1**

With regard to Count III for injunctive relief (specific performance of calf purchase rights), Defendant Benton first argues that injunctive relief and specific performance are remedies, not independent causes of action. It further argues that, nevertheless, injunctive relief is unavailable because an adequate remedy at law exists, injunctive relief is inappropriate because the Rental Agreement's terms are indefinite, and injunctive relief is unavailable to enforce contract provisions that require ongoing court supervision.

"With respect to injunctive relief, that is a remedy, not a cause of action, and thus should not be pleaded as a separate count." *Knutson v. Vill. of Lakemoor*, 932 F.3d 572, 576 n.4 (7th Cir. 2019); *see also Onyango v. Downtown Ent., LLC*, 525 F. App'x 458, 460 (7th Cir. 2013) (unpublished opinion) ("An injunction is a type of remedy . . . as distinct from an underlying claim for relief . . . [The plaintiff] should

not have characterized his request for injunctive relief as a separate count of his complaint . . ."); *CustomGuide v. CareerBuilder, LLC*, 813 F. Supp. 2d 990, 1002 (N.D. Ill. 2011) ("[A]n injunction is an equitable remedy, not a separate cause of action.") (internal citation omitted). Also, "specific performance is a remedy, not a cause of action." *LaSalle Nat'l Bank v. Metro. Life Ins. Co.*, 18 F.3d 1371, 1376 (7th Cir. 1994). Notably, here, Plaintiff Middle Fork does not address this point in its Response (D. 15) to the Defendant's Motion to Dismiss, choosing instead to argue only against the Defendant's additional challenges to Count III.

The case law makes clear that the Court must dismiss the Plaintiff's Count III for injunctive relief/specific performance. The procedural posture of this case illustrates why the distinction between causes of action and remedies is a distinction *with* a difference. The Court is essentially being asked to consider the Plaintiff's Motion for Preliminary Injunction in the context of a Rule 12(b)(6) motion. That is irregular to say the least. Importantly, the dismissal of Count III is only that; the Plaintiff included a request for permanent injunctive relief in its "Wherefore" section, Paragraph c) of the Complaint, and it remains there, though Paragraph c)'s reference to Count III is now rendered superfluous. The Court expresses no opinion herein as to whether Middle Fork may ultimately be entitled to equitable injunctive relief, preliminary or permanent.

**2**

With regard to Count IV alleging fraud in the inducement (in the alternative), Defendant Benton makes four arguments in support of dismissal, and the Court addresses each in turn. The elements of fraudulent inducement under Illinois law[4] are: 1) a false statement of material fact; 2) the defendant's knowledge

[4] The Court has jurisdiction over this matter based upon diversity of citizenship, 28 U.S.C. § 1332. Accordingly, the Court applies Illinois substantive law. *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670 (7th Cir. 2008) ("It is, of course, well established that, as a general

that the statement was false; 3) the defendant's intent that the statement induced the plaintiff to act; 4) the plaintiff's reliance upon the truth of the statement; and 5) the plaintiff's damages resulting from reliance on the statement. *Enter. Recovery Sys., Inc. v. Salmeron*, 927 N.E.2d 852, 858 (Ill. App. Ct. 2010).

Defendant Benton first argues Middle Fork's fraudulent inducement allegations do not satisfy the heightened pleading requirements for fraud claims. *See* FED. R. CIV. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). According to Benton, Middle Fork's Complaint fails to provide the requisite detail as the primary allegation is that Benton represented that it would perform according to the terms of the Rental Agreement. A plaintiff must describe the who, what, when, where, and how of the fraud. *U.S. ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016). However, a district court must not "take an overly rigid view of the formulation," *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011), and "[p]leading with particularity does not require perfect precision." *Five-Star AudioVisual, Inc. v. Unique Bus. Sys. Corp.*, 769 F. Supp. 3d 840, 851 (N.D. Ill. 2025). The Seventh Circuit has found the pleading requirements of Rule 9(b) satisfied where a complaint "painted a sufficiently detailed picture of the alleged scheme."[5] *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011). Plaintiff Middle Fork argues that the Complaint does just that, and the pertinent allegations, taken

---

matter, a district court exercising jurisdiction because the parties are of diverse citizenship must apply state substantive law and federal procedural law.") (citing *Erie R.R. v. Tompkins*, 304 U.S. 64 (1945)).

[5] The word "scheme" as used in *AnchorBank, FSB* is not the same "scheme" as used in the scheme exception considered later in this Order. *See AnchorBank, FSB*, 649 F.3d at 614 ("In their second amended complaint, AnchorBank and Plumb alleged that Hofer engaged in a collusive trading scheme in violation of sections 9(a) and 10(b) of the Securities Exchange Act of 1934.").

together, are considerably more than conclusory allegations that Benton never intended to perform.

The Plaintiff alleges the who – its owner Chuck Raup, Benton's representatives, including John Boerman, and Benton's principals. It alleges the what – Benton agreed to revise its original proposal after Middle Fork explained the revised commencement date was critical to ensure Middle Fork would not be left without income while Benton prepared to occupy the farm. It alleges the when – negotiations began in early 2025, Benton expressed in February 2025 an urgent need to start placing some calves at Middle Fork's facility by the fall of 2025, Benton provided an initial draft of the Rental Agreement in April 2025 that proposed a 60-month term and the later-revised commencement date, and the parties' execution of the Rental Agreement on June 26, 2025. The Plaintiff further alleges it insisted upon the revised commencement date after multiple meetings and communications. It alleges the where – the signed Rental Agreement came about after multiple meetings and communications. It alleges the how – Plaintiff Middle Fork was induced into discontinuing its existing cattle operation, obtaining governmental permits, engaging the consulting services of a permitting expert, and otherwise performed all of its preliminary obligations which included undertaking substantial construction to prepare the farm for Benton's specialized use. Middle Fork also alleges after it gave timely oral notice once the permit was secure and the facility was ready to accept Benton's calves by September 2025 and Benton was therefore on the hook to start paying rent, it did not pay rent at any time, it ceased doing its work to get the facility ready, it repudiated the contract, and, ultimately, it sought to force Middle Fork into a distress sale of the facility.

Certainly, the foregoing allegations and the plausible inferences therefrom considered all together paint a sufficiently detailed picture of the alleged fraud. The Defendant's Reply shows it incorrectly expects "perfect precision" in the

Plaintiff's fraud allegations. *Five-Star AudioVisual, Inc.*, 769 F. Supp. 851. As for Defendant Benton's additional argument that its alleged conduct is the opposite of behavior designed to force a fire sale of Middle Fork's facility such that Plaintiff Middle Fork's allegations of fraud make no sense, deciding between competing factual inferences is not the Court's duty at this time. Nevertheless, here, sufficient pleading under Rule 9(b) does not spare the Plaintiff's Count IV from dismissal.

Defendant Benton argues Count IV must be dismissed for the additional reason that it is based on its alleged broken promise to do something in the future. "[M]isrepresentations of intention to perform future conduct, even if made without a present intention to perform, do not generally constitute fraud[.]" *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 682 (Ill. 1989). Plaintiff Middle Fork counters that it does not allege merely that Benton failed to perform a future contractual obligation; rather, it alleges that Defendant Benton used a negotiated promise of future performance as the means of inducing Middle Fork to fundamentally restructure its business before refusing to perform. The Illinois Supreme Court has recognized an exception to the rule, under which "such promises are actionable if the false promise or representation of future conduct is alleged to be the scheme employed to accomplish the fraud." *Id.* (internal citation omitted). To invoke the scheme exception, a plaintiff must allege and prove that, at the time the promise was made, the defendant did not intend to fulfill it. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 570 (7th Cir. 2012). Evidence of said intent would include a "pattern of fraudulent statements, or one particularly egregious fraudulent statement." *Id.* (internal citation omitted).

Here, Plaintiff Middle Fork alleges Defendant Benton's initial draft of the Rental Agreement contained a defined commencement date that would allow Benton to delay bringing cattle and therefore delay rent indefinitely, and the provision was revised after Middle Fork explained to Benton why the suggested

change was critical (Middle Fork's financial situation). Middle Fork alleges Defendant Benton represented, prior to and during contract formation, it would abide by a Rental Agreement term that began upon Middle Fork's securing the necessary permit (and not upon Benton's convenience), timely perform the construction and preparation necessary to commence calf operations, and maintain the Rental Agreement as a long-term arrangement beneficial to both parties, and Benton assured Middle Fork of its good faith, inducing Middle Fork to invest in the project and cease other business. The Complaint also alleges once Middle Fork completed its acts of reliance, Benton insisted it would not start paying rent or delivering calves, which it projected would be several months later in early 2026 after winter, due to its staffing issues and construction delays. The Complaint alleges rather than cure its defaults or give assurances that they would work in good faith to accommodate Middle Fork in any way under the contract, Benton immediately ceased doing its work and began a disguised effort to remove all of its fixtures and personal property, and following its actions indicating it was abandoning the property, immediately sought to buy the entire property from Middle Fork at a discounted price, believing its default was creating a financial crisis for Middle Fork that it could take advantage of.

The Plaintiff fails to state a claim for fraudulent inducement. Missing from the allegations above, and the Complaint as a whole, are allegations of a pattern of fraudulent statements or one particularly egregious fraudulent statement. The Plaintiff attempts to argue that when the Complaint is read as a whole, rather than isolating the negotiated commencement provision of the Rental Agreement from the surrounding factual allegations, it "alleges precisely the type of reliance-inducing scheme recognized [in a cited and discussed Illinois case] and reaffirmed by the authorities Benton itself cites." Pl.'s Resp. (D. 15 at ECF p. 10). But the Plaintiff goes on to state that "the negotiated commencement provision" was the

scheme employed to accomplish the fraud. It is not enough to rely on a contractual provision to make out a fraudulent inducement claim. *See Bower v. Jones*, 978 F.2d 1004, 1012 (7th Cir. 1992) (explaining "[p]romissory fraud is a disfavored cause of action in Illinois because fraud is easy to allege and difficult to prove or disprove[]" and therefore, "the burden on a plaintiff claiming [fraudulent inducement] is deliberately high[]"). The Court has reviewed the parties' cited cases and none of those cases found a fraudulent inducement claim was sufficiently stated where based only upon a contractual provision. Rather:

> In order to survive the pleading stage, a claimant must be able to point to specific, objective manifestations of fraudulent intent – a scheme or device. If he cannot, it is in effect presumed that he cannot prove facts at trial entitling him to relief. If the rule were otherwise, anyone with a breach of contract claim could open the door to tort damages by alleging that the promises broken were never intended to be performed.

*Id.* (quoting *Hollymatic Corp. v. Holly Sys., Inc.*, 620 F. Supp. 1366, 1369 (N.D. Ill. 1985). Plaintiff Middle Fork alleges that negotiations before the parties executed the Rental Agreement were regarding the commencement date and resulted in the version ultimately executed, but there are no allegations of fraudulent statements made during that time (actually, the Plaintiff got the commencement date language it wanted). Here, the Plaintiff has merely repackaged its breach-of-contract claim as a claim for fraud.

For the sake of completeness[6], the Court considers the Defendant's third challenge to Count IV. The Court rejects Defendant Benton's challenge that its "settlement offer" – its alleged offer to buy Middle Fork's property to resolve the contractual dispute – is inadmissible pursuant to Federal Rule of Evidence 408 to

[6] The allegations Defendant Benton seeks to have stricken are not contained within Count IV; those allegations appear in the "Factual Background (Common Facts)" section of the Plaintiff's Complaint, necessitating the Court to still address this argument. Pl.'s Compl. (D. 1 at ECF p. 3).

prove the validity of Middle Fork's fraudulent inducement claim. Benton contends its offer of compromise should be stricken from the Complaint. Rule 408 "prohibits the use of evidence arising from compromise negotiations and offers to compromise[.]" *Kritikos v. Palmer Johnson, Inc.*, 821 F.2d 418, 421 (7th Cir. 1987) (citing FED. R. EVID. 408). The allegations of the Plaintiff's Complaint do not include any reference to settlement or to the parties' attempts (if any) to engage in settlement negotiations, and so Benton cannot simply assert at this stage of the proceedings that its offer to purchase the property necessarily falls within Rule 408. The Court joins those courts that find Rule 408 inapplicable to motions to strike material from complaints because Rule 408 is an evidentiary rule and a complaint is not evidence, only allegations. *McCladdie El v. United Airlines, Inc.*, No. 24 CV 4385, 2025 WL 50641, at *5 (N.D. Ill. Jan. 8, 2025) (collecting cases).

The Defendant's fourth "challenge" to Count IV – that the remedy for fraud in the inducement is rescission – is summarily rejected. There appears no dispute between the parties that rescission is a remedy for fraudulent inducement. *See Extra Equipamentos E Exportacao Ltda. v. Case Corp.*, 541 F.3d 719, 726 (7th Cir. 2008) ("the remedy for fraud in the inducement is to rescind the contract[]"). As the Plaintiff argues, whether it ultimately may recover rescission, damages, equitable relief, or some other remedy becomes relevant only if it first establishes liability. It does not determine whether the Complaint adequately alleges the elements of fraudulent inducement. Furthermore, in light of this Order, the argument is moot at this time now that the Court has found the Plaintiff fails to state a claim for fraudulent inducement.

The Defendant's Motion to Dismiss is granted in its entirety.

**B**

In its Motion to Dismiss, Plaintiff Middle Fork contends Defendant Benton's counterclaim Count II should be dismissed or narrowed, counterclaim Count V

should be dismissed or limited, and counterclaim Counts III and IV should be dismissed in part. Without citation to any caselaw whatsoever, the Plaintiff argues Benton's Count II for declaratory judgment is duplicative, Benton's Count III for conversion and Count IV for replevin should be dismissed in part because Benton lacks standing to recover Keystone Cooperative property, and Count V for unjust enrichment should be dismissed or limited because an express contract governs. In response, Defendant Benton takes issue with the Plaintiff's failure to cite authority, arguing the failure to include relevant legal authority is fatal to the Plaintiff's Motion to Dismiss in all respects. Benton nevertheless argues the Plaintiff's arguments fail as to each of the challenged counterclaims.

"The Seventh Circuit's standard for Rule 12(b)(6) motions controls[]" in the context of a motion to dismiss counterclaims. *Kranos IP Corp. v. Riddell, Inc.*, 334 F. Supp. 3d 907, 912 (N.D. Ill. 2018). Thus, the counterclaim "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quoting *Iqbal*, 556 U.S. at 678). In its application of the Rule 12(b)(6) standard for the Defendant's challenged counterclaims, the Court bears in mind the fact that the failure to present any legal authority, Plaintiff Middle Fork's failure here, amounts to waiver. *See APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 631 (7th Cir. 2002) ("It is not this court's responsibility to research and construct the parties' arguments, and conclusory analysis will be construed as waiver.") (internal citations omitted); *see also* CIVIL LR 7.1(B)(1) (explaining, in pertinent part, that "Every motion raising a question of law . . . must include a memorandum identifying the specific points or propositions of law and supporting authorities upon which the moving party relies . . .").

The Court dismisses Defendant Benton's counterclaim Count II for declaratory judgment as duplicative. "Where a counterclaim merely restates an issue already before the Court, it is well settled that such repetitious and

unnecessary pleadings should be stricken." *Soos & Assocs., Inc. v. Five Guys Enters., LLC*, 425 F. Supp. 3d 1004, 1013 (N.D. Ill. 2019) (internal citation omitted). Plaintiff Middle Fork argues that the issues already raised by Middle Fork's Complaint, Benton's Answer, Benton's affirmative defenses, and Benton's substantive counterclaims are the same issues raised by Benton's Count II. *Neither* party cites case law in support of their position, but on the face of the parties' pleadings, indeed, it appears Defendant Benton's declaratory judgment counterclaim merely restates issues already before the Court, albeit by pleading facts that extend beyond those alleged in the Plaintiff's Complaint.

The Plaintiff's request to dismiss counterclaims Count III for conversion and Count IV for replevin is denied as Defendant Benton sufficiently states a claim for each under the Rule 12(b)(6) standard. To state a claim for conversion under Illinois law, a plaintiff must allege: 1) he has a right to the property at issue; 2) he has an absolute and unconditional right to the immediate possession of the property: 3) he has made a demand for possession of the property; and 4) the defendant has wrongfully assumed control, dominion, or ownership of the property without authorization. *Song v. PIL, L.L.C.*, 640 F. Supp. 2d 1011, 1017 (N.D. Ill. 2009) (citing *Loman v. Freeman*, 890 N.E.2d 446, 461 (Ill. 2008)). Here, Defendant Benton alleges it is the owner or responsible agent for the personal property, it specifies the personal property at issue, it details the demand made for the property's return, and it details Middle Fork's conduct in locking the facility and denying access, all in the context of the general background allegations.

Section 5/19-101 of Chapter 735 of the Illinois Compiled Statutes states, "Whenever any goods or chattels have been wrongfully distrained, or otherwise wrongfully taken or are wrongfully detained, an action of replevin may be brought for the recovery of such goods or chattels, by the owner or person entitled to their possession." 735 ILL. COMP. STAT. 5/19-101. As with its conversion allegations,

Defendant Benton sufficiently alleges the elements of its replevin claim where it incorporates its conversion counterclaim allegations, adds that the personal property has not been seized for tax, assessment, or fines against Benton, and Middle Fork detains the property despite Benton's demand for it.

With regard to Plaintiff Middle Fork's argument that Benton lacks standing to recover Keystone Cooperative property, Middle Fork cites no authority for its argument, the plain language of the statute provides a replevin action is available to a person merely entitled to possession, and a letter from Benton's counsel identified the property at issue as "its [Benton's] personal property", that "Benton also has removable equipment and supplies on site", and stating Middle Fork should provide representatives from Benton an opportunity to remove the personal property including Keystone Cooperative's tanks, rendering it plausible that Benton has standing to pursue both its conversion and replevin counterclaims as to all the personal properly mentioned in Counterclaims III and IV. Nor will the Court at this time scour these two counterclaims for "theories" the Plaintiff argues (without citation to authority) do not apply as to conversion and replevin causes of action. The Plaintiff's last challenge to these two counterclaims – that any surviving property claim should be limited to specifically identified non-fixture personal property plausibly owned by Benton – expects too much at the motion to dismiss stage.

The Plaintiff's request to dismiss counterclaim Count V for unjust enrichment (in the alternative) is denied. Middle Fork argues counterclaim Count V incorporates the contract allegations and seeks quasi-contract recovery for benefits governed by a written agreement, so the contract dispute is simply repackaged as equity and must be barred. *See Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013) ("In Illinois recovery for unjust enrichment is unavailable where the conduct at issue is the subject of an express contract between the

plaintiff and defendant.") (citing *Guinn v. Hoskins Chevrolet*, 836 N.E.2d 681, 704 (Ill. App. Ct. 2005)). While true that Benton's earlier allegations are incorporated into its Count V, Benton makes no express mention of the parties' Rental Agreement in its Count V, it alleges Middle Fork retained the benefits of Benton's improvements and investments without payment for such materials and labor, alleges Benton's improvements exceed $400,000, and alleges Middle Fork has retained and used Benton's personal property. Pleading in the alternative, which is of course generally allowable, Fed. R. Civ. P. 8(d)(2), is particularly permissible here as Defendant Benton has pled as follows: 1) there is an express contract, and Middle Fork is liable for breach of it; and 2) if there is *not* an express contract, then Middle Fork is liable for unjustly enriching itself at Benton's expense. *See Cohen*, 735 F.3d at 615 (recognizing availability of pleading in the alternative and specifying the permissible way to inconsistently plead in the context of breach of contract and unjust enrichment).

**III**

In its Motion to Strike Certain Affirmative Defenses, Plaintiff Middle Fork requests the Court strike Defendant Benton's second, fourth, seventh, and eighth affirmative defenses as well as Benton's reservation-of-rights paragraph. Defendant Benton counters that moving to strike affirmative defenses complicates a case, creates more clutter, and in the end serves little to no purpose.

Federal Rule of Civil Procedure 12(f) provides that, "The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Motions to strike are generally disfavored because they potentially serve only to delay. *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989); *Williams v. Jader Fuel Co., Inc.*, 944 F.2d 1388, 1400 (7th Cir. 1991) (stating that motions to strike are not favored and "will not be granted unless it appears to a certainty that plaintiffs would succeed despite any state of

the facts which could be proved in support of the defense[]" and "are inferable from the pleadings[]") (collecting cases). Moreover, courts do not generally grant motions to strike unless the defect in the pleading causes prejudice to the party bringing the motion. *Hoffmann v. Sumner*, 478 F. Supp. 2d 1024, 1028 (N.D. Ill. 2007).

Here, the Plaintiff's Motion to strike four of the Defendant's eight affirmative defenses serves to delay this case. This is particularly so where the Plaintiff provides no authority beyond the Rule 12(f) standard in support of its argument, yet again leaving the heavy lifting to the Court. The allegations contained in the parties' respective Motions to Dismiss reveal there is anything but certainty as to the ultimate success or failure of Defendant Benton's affirmative defenses. In any event, the Defendant has put the Plaintiff on notice sufficient for the parties to engage in meaningful discovery on all of the Defendant's affirmative defenses, precluding prejudice to Plaintiff Middle Fork. As for the Defendant's reservation of the right to assert additional defenses as discovery proceeds, it is the Plaintiff's request to strike that single, cover-the-bases sentence which unnecessary clutters this case. The Plaintiff's Motion to Strike is denied in its entirety.

**IV**

For the reasons set forth *supra*, Defendant Benton Dairy LLC's Motion to Dismiss Counts III and IV (D. 8) is GRANTED. Count III of the Plaintiff's Complaint is DISMISSED WITH PREJUDICE and Count IV of the Complaint is DISMISSED WITHOUT PREJUDICE. Plaintiff Middle Fork Cattle Company, LLC's Motion to Dismiss Certain Counterclaims and Strike Certain Affirmative Defenses (D. 20) is GRANTED IN PART AND DENIED IN PART. The Plaintiff's Motion is granted insofar as the Defendant's Counterclaim Count II for

declaratory judgment is DISMISSED as duplicative and is denied in all other respects.

Should a party file a motion for reconsideration which is subsequently denied by the Court, the party who filed the motion will be responsible for the attorney's fees of the opposing party related to their response to the motion for reconsideration.

This matter is referred to the Magistrate Judge for further proceedings.

*It is so ordered.*

Entered on August 26, 2026

s/Jonathan E. Hawley
U.S. DISTRICT JUDGE